IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NICOLE CAMPBELL,[1]

Plaintiff,

v.

MICHAEL GIERACH and JARED HOY,

Defendants.

OPINION and ORDER

24-cv-530-jdp

---

Plaintiff Nicole Campbell is a male-to-female transgender prisoner who received gender-affirming surgery pursuant to an injunction issued in a previous case. *Nicole Campbell v. Kevin Kallas*, Case No. 16-cv-261 (W.D. Wis. Dec. 12, 2020).

In this case, Campbell alleges that employees of her current prison, Taycheedah Correctional Institution, have, pursuant to policy, assigned her to a single cell based on her transgender status. Campbell is proceeding on a Fourteenth Amendment equal protection claim for injunctive relief against her prison's warden, Michael Gierach, and Department of Corrections Secretary Jared Hoy, both in their official capacities.

The parties cross-move for summary judgment. Dkt. 35 and Dkt. 41. Campbell is no longer being housed in a single cell, so her claim for injunctive relief is moot. Campbell raises new variants of her equal protection claim in her summary judgment materials, but I will not allow this last-minute attempt to amend the complaint. And Campbell's new claims challenging her current assignment to a dormitory unit would fail on the merits anyway. I will grant defendants' cross-motion, deny Campbell's cross-motion, and close the case.

---

[1] Plaintiff's legal name is Mark A. Campbell, but the court will follow its usual practice of referring to transgender prisoners with their preferred names and pronouns.

## UNDISPUTED FACTS

I begin with a word about Campbell's opposition to defendants' cross-motion for summary judgment. The court's summary judgment procedures require a party who brings a motion, or a cross-motion, for summary judgment to set out a statement of proposed facts with citations to admissible supporting evidence. *See* the attachment to Dkt. 18 at 2–4. The party opposing the motion must state whether each fact is disputed, and if it is, support the opposition with a citation to a specific piece of admissible evidence. *Id.* at 3–5. The court cautions the parties that it won't search the record for evidence that supports their contentions. *Id.* at 1, 3, 5. If a response to a proposed fact relies on inadmissible evidence or otherwise does not comply with the court's procedures, the court takes the original factual statement as true and undisputed. *Id.* at 8. All litigants, including unrepresented parties, must comply with the court's orders and rules. *See Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020).

Campbell's opposition to defendants' proposed facts doesn't comply with the court's summary judgment procedures. Campbell fails to support many of her disputes with citations to admissible evidence. Campbell cites the proposed facts accompanying her cross-motion for summary judgment to support some of her disputes, but the proposed facts themselves are not admissible evidence. *See* the attachment to Dkt. 18 at 3–4. Campbell's own proposed facts have problems. Often she fails to support her proposed facts with citations to admissible evidence, and she includes a lot of improper argument. *See id*. at 2.

Defendants' proposed facts are properly supported with admissible evidence so, with two exceptions, I will accept them as undisputed. *See Allen-Noll*, 969 F.3d at 349; *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1177–78 (7th Cir. 2001). I will not accept

defendants' proposed facts as undisputed if they are directly contradicted by: (1) specific factual statements in Campbell's verified complaint for which she has personal knowledge; or (2) any properly supported proposed finding of fact by Campbell.

With that background, the following facts are undisputed except where noted.

**A. DOC policy regarding transgender management and care**

Division of Adult Institutions (DAI) Policy 500.70.27 generally governs management and care for transgender inmates. *See* Dkt. 45-1, 45-2. According to the version of this policy in effect at TCI when Campbell arrived there, if a transgender prisoner was housed at a facility consistent with their gender identity, the initial placement was in a single cell in McCauley Unit or a special management unit. *See* Dkt. 45-1 at 7, 13.[2] The initial placement was to be reviewed case-by-case on a regular basis, considering prisoner health and safety, and potential programming, management, and security concerns. *See id.* at 5–7, 13. The policy did not mandate permanent single-cell placement.

The policy was revised in early 2025. Dkt. 45-2. In its current form, the policy specifies that both "transgender females" and "reassigned females" who arrive at TCI must initially be placed in a single cell in McCauley Unit or a special management unit. *Id.* at 11. The placement is to be reviewed case-by-case on a regular basis, considering prisoner health and safety, and potential programming, management, and security concerns. *See id.* at 7, 11. Just as before, the new version of the policy does not mandate permanent single-cell placement.

---

[2] There is some uncertainty about whether this provision was meant to apply only to pre-operative transgender prisoners, or to both pre-operative and post-operative prisoners. *See* Dkt. 65-1 at 1. This uncertainty is ultimately immaterial because the case concerns only Campbell in post-operative status.

**B. Campbell's history of cell placement**

Because this case concerns Campbell's cell placements, the court will review her placements, and the reasons for those placements, in some detail.

**1. Initial recovery from surgery**

Campbell arrived at TCI in mid-August 2022, after receiving gender-affirming surgery. While in the infirmary, Campbell received vaginal dilators, devices used to keep the vagina open and prevent stenosis. Campbell was housed in the infirmary for six weeks to monitor her medical progress.

**2. Release from infirmary and initial assignment to single cell**

In late November 2022, Health Services Manager Radcliffe submitted a DOC-2762 Single Occupancy Cell Recommendation of Inmate form. Dkt. 46-2 at 345. Radcliffe wrote that it was appropriate to house Campbell in a single cell because she had a medical restriction to dilate in her cell. *Id.* Campbell was transferred to the Monarch Special Management Unit (MSMU), where she was placed in a single cell on general population status. The single-cell placement served to give Campbell privacy while dilating and to allow her to adjust to living in the general population.

When Campbell was moved to a single cell in the MSMU, she started a hunger strike and began refusing medications because she wanted a cellmate. She was temporarily housed in an observation cell.

In early January 2023, the mental health multi-disciplinary team met to discuss Campbell's desire for a cellmate. The multi-disciplinary team meets weekly to discuss the treatment and management of prisoners who, like Campbell, have difficult mental health issues. The multi-disciplinary team includes psychological services unit (PSU) staff, and at least

one representative from psychiatry, security, and the health services unit (HSU). Team members were concerned that Campbell could make a cellmate feel uncomfortable if she dilated in the cell, even if she performed that procedure discreetly. Dkt. 46-1 at 8. In early February 2023, the team met with HSU staff. *See* Dkt. 46-2 at 346. Staff noted that Campbell was refusing treatment, and it continued to support single-cell placement. *See id.*

In mid-February 2023, Campbell received a conduct report for making an improvised device that prisoners use to heat water in their cells. Campbell was transferred to the restrictive housing unit (RHU), where she stayed until mid-March of that year. Meanwhile, TCI's warden at the time, Jennifer McDermott, approved the multi-disciplinary team's single-cell recommendation. Dkt. 46-2 at 347. That restriction was in place for six months.

Upon her release from the RHU, Campbell returned to the MSMU. She overdosed on Tylenol in mid-April 2023 to protest the single-cell restriction. *See* Dkt. 62 ¶ 66. When Campbell returned from the hospital, she was placed on observation status, where she started a hunger strike to protest the restriction. While on that status, Campbell received a conduct report for disruptive conduct and disobeying orders based on her behavior during the hospital trip, and she was sentenced to 60-days' disciplinary segregation. *See id.* ¶ 69.

In late May 2023, following episodes of self-harm, Campbell was moved to a single cell in the MSMU. Around that time, the multi-disciplinary team decided that Campbell would remain in a single cell, and it discussed implementing a behavior management plan. In mid-July 2023, Campbell received a conduct report based on threatening emails to Corrections Program Supervisor Bruno, and she was sentenced to 90 days' disciplinary segregation. *See* Dkt. 62 ¶¶ 80–81; Dkt. 45-10.

Later that month, the multi-disciplinary team discussed Campbell's status. The team noted that, since her return to the MSMU, Campbell had not engaged in treatment. Dkt. 46-1 at 30. But the team noted that, if Campbell met treatment expectations, Bruno would consider lifting her single-cell restriction. Campbell's need to dilate, the team determined, was an insufficient medical reason to house her in a single cell. The plan was for HSU staff to work with the MSMU to establish a way for Campbell to dilate in a private while having a cellmate. The team also noted that Campbell, a convicted sex offender, had a "predatory nature," and it wrote that she had received multiple complaints under the Prison Rape Elimination Act (PREA) before her transfer to TCI. *See id.*; Dkt. 62 ¶ 79. Plaintiff says that she did not receive any PREA complaints before her transfer to TCI, but she doesn't support this statement with admissible evidence. Campbell was twice placed on clinical observation in July 2023.

The multi-disciplinary team met in early August 2023. The team noted that Campbell had not met treatment expectations, and that it would reconvene to discuss her status. *See* Dkt. 62 ¶ 82. Campbell returned to the MSMU in late August 2023.

**3. Release from initial placement in single cell**

In mid-September 2023, the multi-disciplinary team noted that Campbell had received positive feedback from staff. The team supported lifting the single-cell restriction and implementing a plan for Campbell to use a private space to dilate.

Later that month, a community member emailed Wisconsin legislators, complaining that the DOC was housing "a man" in a women's prison because the prisoner identifies as a woman. Dkt. 65-3 at 2. A state senator's office inquired about the email with the DOC. *Id.* There is no direct evidence that the DOC took any action concerning Campbell on the basis of the legislative inquiry.

In early October 2023, a prison psychologist, Sara Conklin-Weaver, submitted a DOC-2762 form, which is used to recommend single-cell placement. Dkt. 46-2 at 348. Conklin-Weaver wrote that Campbell had been assigned to a single cell because she needed to dilate and had a history of "crossing sexual boundaries, in the community and while incarcerated, which suggested that the medical devices [might] create a security concern." *Id.* The team, however, recommended that Campbell be housed with another prisoner. *Id.* at 349. The team found that Campbell had been engaging in treatment and that the concerns about dilating near another prisoner could be mitigated by working around her cellmate's schedule or allowing her to dilate in a separate area. *See id.* McDermott approved the team's recommendation. *Id.* at 350.

In early December 2023, Campbell was assigned to a double cell in McCauley Unit. She was initially allowed to dilate in the HSU. Dkt. 62 ¶¶ 94–95. Later that month, HSU staff learned that Campbell had failed to report to the HSU and grew concerned that she was dilating in her cell. *See id.* ¶ 95. Staff collected Campbell's dilators and supplies and planned to keep them in the HSU unit going forward. Around that time, Campbell was moved to another double cell in McCauley Unit.

**4. Reassignment to single cell**

In early January 2024, Campbell was moved to a single cell in the MSMU. The multi-disciplinary team determined that she needed additional monitoring because she had not complied with her plan of care regarding dilation. Campbell had refused to dilate in the HSU because she believed that it was unsanitary and uncomfortable, and she had started dilating with tampons in her double cell. *See id.* ¶¶ 98–99, 103. She had also stopped taking

medications, including psychotropics and estrogen, because HSU staff had taken her dilators. *See id.* at ¶¶ 101, 109, 112.

In late January 2024, Assistant Health Services Manager Paul Mittelsteadt met with other members of the multi-disciplinary team and with Campbell about her refusal to take medications and dilate in the HSU. The team discussed changes that had been made in the HSU to address Campbell's concerns, and she agreed to restart dilating there. *See id.* ¶¶ 113–14. The plan was to move Campbell to McCauley Unit if she dilated in the HSU and not in her cell. Campbell was moved back to that unit in early February 2024, where she had cellmates.

In late February 2024, Campbell was assigned to a single cell in McCauley Unit. *See id.* ¶ 123. That month, Security Director Nicholas Tennessen entered a single-cell restriction. Dkt. 37-35 at 1–2. Campbell had largely refused to dilate that month. *Id.* ¶ 119.

In early March 2024, DAI Administrator Sarah Cooper emailed McDermott about Campbell. Dkt. 65-5 at 1. Cooper wrote that she spoke with Hoy that day "about the single cell placement of the post-operative transgender individuals at TCI." *Id.* Hoy, according to Cooper, "indicated this might be a long term placement," and that there were "discussions occurring at a higher level." *Id.* Hoy, Cooper continued, said that they would "need to continue to simply say the single cell placement [would] stay in effect while some things [were] being looked into." *Id.*

Hoy says that he and Cooper were aware of concerns about Campbell from the community and other prisoners, and that she had been refusing to participate in her medical care. Dkt. 44 ¶ 21. Hoy also says that it was recommended that Campbell return to single-cell status to investigate "the behavioral, medical and security concerns." *Id.* Hoy adds that the discussions were focused on Campbell's behavior and did not serve to set any housing policy

applicable to the entire transgender female population. *Id.* TCI's current warden, defendant Gierach, says that prison officials considered, among other factors, "public (including Plaintiff) interest" when determining her single-cell placement. *See* Dkt. 37-50 at 4.

Campbell says that, in mid-March 2024, McDermott spoke with her in person. Dkt. 1 ¶ 80. According to Campbell, McDermott said that someone from "a higher level" ordered McDermott to restrict all post-operative male-to-female transgender prisoners at TCI to single cells. *See id.* Campbell says that there were two such prisoners, herself included, at TCI then.

Campbell continued to refuse to dilate in March 2024. Late that month, Campbell was placed on clinical observation because she refused to meet with psychological services staff or commit to safety.

In mid-April 2024, in response to an inmate complaint from Campbell, prison officials contacted the DOC Mental Health Director Kevin Kallas. Dkt. 37-46 and Dkt. 65-1. Kallas expressed skepticism that DAI Policy 500.70.27 required post-operative transgender prisoners to be initially housed in a single cell on arrival to TCI. *See* Dkt. 65-1 at 1. Kallas added that, from what he knew, Campbell was being housed in a single cell based on her behaviors, and that "TCI could confirm that." *Id.*

Later that day, McDermott emailed several staff members about the inmate complaint. Dkt. 65-2. McDermott said that Campbell's single-cell placement was not "because of her behaviors, but based on direction given to us from Administrators," and that "[t]his direction impact[ed] an additional post-operative person." *Id.* at 1.

In late April 2024, the multi-disciplinary team discussed Campbell's status. She was having difficulties in McCauley Unit, so staff wanted to move her to a single cell in Abrahamson (AB) Unit. The team also discussed the possibility of moving Campbell to the Wisconsin

Women's Resource Center (WWRC) for additional treatment. WWRC provides temporary specialized mental health services to female prisoners. On Campbell's request, she was moved to a single cell in AB Unit in early May 2024.

Campbell continued to refuse to dilate through early July 2024. At that time, she went to the HSU and threatened to destroy her dilators. The next day, the multi-disciplinary team gave Campbell her dilators for use in her cell on the condition that she would be held responsible if she destroyed them. *See* Dkt. 62 ¶ 148. That day, Campbell discarded her dilators. Staff ordered new dilators, but it allowed Campbell to use them only in the HSU. Campbell continued to refuse dilating. In late August 2024, Campbell was transferred to WWRC.

**5. Return to TCI and assignment to dormitory unit**

Upon returning to TCI in December 2024, Campbell was assigned to the Dormitory Unit, an open housing unit with 150 bunk beds along the outer walls of four quadrants. Each quadrant has a dayroom with tables in the middle. There are shared changing rooms, showers, and toilet stalls on each side of the unit. The Dormitory Unit is an ideal unit for a prisoner who requires extra monitoring. *See* Dkt. 62 ¶ 161. The open setting allows staff to monitor and observe individuals, and prisoners can easily report concerns like self-harm ideation or rule breaking to staff. *See id.* The restriction assigning Campbell to the Dormitory Unit states that it is "[p]ermanent" and "until further notice." Dkt. 37-49 at 1.

Campbell continued to refuse to dilate and threatened to perform surgery on herself if her vagina closed. In mid-February 2025, Campbell was moved to the MSMU based on threats of self-harm. *See* Dkt. 62 ¶ 165. A month later, Campbell returned to the Dormitory Unit. She

has remained in the Dormitory Unit since then, moving to other units only temporarily for disciplinary reasons. *See id.* ¶¶ 167, 177–79, 185, 187–88, 194.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

**A. Campbell's original challenge to single-cell placement**

Campbell is proceeding on an equal protection claim based on the allegation that she is being housed in a single cell pursuant to an institution- or system-wide policy to assign post-operative male-to-female transgender prisoners to single cells. In her complaint, Campbell seeks to enjoin this policy so that she can be assigned to a two-person cell. *See* Dkt. 12 at 10 (court's summary of complaint's allegations). In her response to defendants' cross-motion, Campbell concedes that she's "no longer in a single cell." Dkt. 52 at 1. This concession raises the issue of whether the case is moot.

Federal courts lack subject matter jurisdiction when a case becomes moot. *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011). As a general principle, a case becomes moot when it no longer presents an "actual controversy," or "live dispute." *See Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017); *Lehn v. Holmes*, 364 F.3d 862, 870 (7th Cir. 2004). If an event occurs while a case is pending that makes it impossible for the court to grant any effective relief to the plaintiff, the case must be dismissed as moot. *See Pakovich*, 653 F.3d at 492.

The basic rule is that if a prisoner is transferred to another prison, her request for injunctive relief against officials at the first prison is moot unless she can demonstrate that she is likely to be transferred back to the first prison. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Along similar lines, the court of appeals has concluded that a prisoner's claim for

injunctive relief challenging his conditions in segregation was moot after he was transferred to general population and therefore was no longer subject to those conditions. *See Knox v. McGinnis*, 998 F.2d 1405, 1413 (7th Cir. 1993). Other courts have reached the same basic conclusion. *See Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007) ("[C]ourts . . . have held that the transfer of an inmate from a unit or location where [s]he is subject to the challenged policy, practice, or condition, to a different unit or location where [s]he is no longer subject to the challenged policy, practice, or condition moots h[er] claim[] for injunctive . . . relief."); *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993) ("[T]he district court could not provide [the plaintiff] with meaningful relief by entering an injunctive order respecting the [unit] in which [he] no longer was incarcerated.").

The equal protection claim on which I allowed Campbell to proceed is moot. The claim's main idea is that Campbell was housed in a single cell for a discriminatory reason: because she is a post-operative male-to-female transgender prisoner. Campbell sought a court order allowing her to be housed in a cell with another prisoner, Dkt. 1 ¶ 3, and she has in substance received that relief. Campbell has been assigned to the Dormitory Unit since December 2024; she is no longer being housed in a cell by herself.

Placement in an open unit isn't the exact relief that Campbell requested. But, under the Prison Litigation Reform Act, "injunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the [alleged] violation of the federal right." *See Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012); *cf. Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (courts must defer to prison authorities' views on disputed matters of professional judgment). An order specifically requiring prison officials to house Campbell in

a double cell would be greater than necessary to remedy the alleged equal protection violation, contrary to the provisions of the Prison Litigation Reform Act relating to injunctions.

Campbell does not directly contend that she is likely to be reassigned to a single cell based on her status as a transgender individual. In fact, as discussed further below, Campbell shifts her argument in her summary judgment materials. She now contends that the DOC has a policy to assign post-operative male-to-female transgender prisoners to the Dormitory Unit. *See* Dkt. 36 at 2; Dkt. 52 at 1. And she says that the only two post-operative male-to-female transgender prisoners at TCI are being housed in the Dormitory Unit pursuant to this alleged policy. So Campbell's own arguments show that there's no "substantial likelihood" that she will be assigned to a single cell based on a policy to assign transgender prisoners to single cells if the lawsuit ends. *See Ozinga*, 855 F.3d at 734.

Campbell has been assigned to the Dormitory Unit since December 2024, and her housing restriction states that this assignment is permanent. Campbell's official assignment to the Dormitory Unit for 20 months strongly indicates that she is unlikely to be reassigned to a single cell if the lawsuit ends. Campbell suggests that she could be reassigned to a single cell because she was moved to the MSMU in mid-February 2025. But it's undisputed that Campbell was moved to the MSMU based on threats of self-harm, and that she returned to the Dormitory Unit a month later. Campbell has remained in the Dormitory Unit since then, moving to other units only temporarily for disciplinary reasons. Campbell's temporary placement in the MSMU 17 months ago to ensure her own safety doesn't support even an inference that defendants will reassign her to a single cell if the lawsuit ends. *Cf. Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) ("Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated.").

Campbell also argues that she was assigned to a single cell based on "public interest." Campbell suggests that because she is a post-operative male-to-female transgender prisoner, the public was concerned, based on sex-based stereotypes, that she could assault a cisgender female prisoner. So, the argument goes, DOC officials assigned her to a single cell to quell the public outcry. I will accept for purposes of this opinion that the evidence would permit a reasonable jury finding that Campbell was reassigned to a single cell in January 2024 based in part on concerns about how the public would react to her placement in a double cell with a cisgender female prisoner. But Campbell is no longer being assigned to a single cell; that alleged constitutional deprivation has ceased.

DAI Policy 500.70.27's policy to initially assign transgender female prisoners and reassignment female prisoners is still in place. But there is no evidence that Campbell is likely to be transferred to another facility in which she would be initially assigned to a single cell based on that policy. Mere speculation that Campbell could be subject to a policy to assign post-operative male-to-female transgender prisoners to a single cell at some future point does not defeat mootness. *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009); *Higgason*, 83 F.3d at 811. Campbell's equal protection claim for injunctive relief challenging her assignment to a single cell is moot.

**B. Campbell's new challenge to placement in the Dormitory Unit**

Regarding Campbell's new challenge to her placement in the Dormitory Unit, the general rule is that a plaintiff may not amend her complaint through arguments raised for the first time in her summary judgment materials. *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017); *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). Campbell attempted to raise this claim in her proposed amended complaint. *See* Dkt. 21 ¶ 59.

But, in her motion for leave to amend, Campbell did not specify that she sought to raise this claim. *See* Dkt. 20 at 2. I denied that motion because Campbell didn't provide a good reason to allow amendment. *See* Dkt. 22. If Campbell thought that my order was erroneous, she should have moved for reconsideration. But I will not Campbell to raise the claim in an unauthorized, last-minute amendment at summary judgment. *Cf. Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 485–86, 490 (7th Cir. 2023) (affirming district court's decision not to treat claim raised in summary judgment as motion to amend where court had denied leave to amend as moot and plaintiff failed to seek further amendment).

But even if I allowed the amendment, defendants would be entitled to summary judgment on Campbell's claim challenging her assignment to the Dormitory Unit. Campbell contends that DAI Policy 500.70.27 "strictly requires housing all [post-operative] male to female transgender inmates in the [Dormitory Unit]." Dkt. 36 at 2. This contention misstates the policy. The policy does not require male-to-female transgender prisoners to be housed in any particular unit after the initial period in a single cell ends. *See* Dkt. 45-2 at 7, 11; *see also Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (stating that "mere conjecture, unsupported by any evidence or reasonable inference" creates a "false issue" and therefore cannot overcome summary judgment). Campbell appears to concede in her reply in support of her proposed facts that she has not been assigned to the Dormitory Unit "due to policy." *See* Dkt. 65 ¶ 14.

Nevertheless, Campbell says in her proposed facts that PSU Manager Dr. Greene told her that all post-operative transgender prisoners "are to be strictly housed [in] the Dorms," and that the order came from "WDOC Administration in Madison." Dkt. 37 ¶ 60. Campbell also says that PSU Clinician Dr. Christiansen told her that Christiansen thought that this

restriction was to make it harder for prisoners to attempt suicide. *Id.* ¶ 61. Campbell's proposed facts themselves are not admissible evidence, and the exhibits that she cites fail to support them. *See* Dkt. 65 ¶¶ 60–61 (citing Dkts. 65-2, 65-3, 65-4, 65-5). But even if Campbell had been placed in the Dormitory Unit pursuant to a policy to mitigate the risk of suicide, that fact doesn't show that the policy is discriminatory. It's undisputed that Campbell has serious mental health issues and a history of suicide attempts and other acts of self-harm; there was ample reason for DOC officials to be concerned about potential suicide. It's also undisputed that the Dormitory Unit is an ideal unit for a prisoner who, like Campbell, requires extra monitoring.

Campbell also argues that the decision to house her in the Dormitory Unit was motivated by animus against post-operative male-to-female transgender prisoners. In particular, she argues that this assignment was based on public interest, which she casts as a form of anti-transgender bigotry, not any legitimate correctional interest.

The Equal Protection Clause of the Fourteenth Amendment commands that "no State shall deny to any person within its jurisdiction the equal protection of the laws." *West v. Radtke*, 48 F.4th 836, 851 (7th Cir. 2022) (alteration adopted) (citing U.S. Const. amend. XIV, § 1). This clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

To support the theory that her current housing assignment is discriminatory, Campbell relies on communications that occurred in April 2024 or before. *See* Dkt. 1 ¶ 80; Dkt. 37-50 at 4; Dkt. 44 ¶ 21; Dkt. 65-2 at 1; Dkt. 65-5 at 1. But Campbell wasn't assigned to the Dormitory Unit for another eight months. That timing doesn't suggest that any concerns from

DOC officials about the public's perception of placing Campbell in a cell with a cisgender female prisoner factored into the decision to assign her to the Dormitory Unit.

Also, the undisputed facts also show that Campbell's assignment to the Dormitory Unit was based on individualized correctional considerations. As recounted above, Campbell has serious psychological, behavioral, and medical issues, including: (1) multiple disciplinary violations; (2) several placements on observation and in a mental health facility; (3) self-harm episodes and ideation; and (4) repeated refusals to follow her plan of care for both medical and mental health issues. The Dormitory Unit is an appropriate unit for a prisoner who, like Campbell, requires extra monitoring.

Campbell notes that she and TCI's only other post-operative male-to-female transgender prisoner are both assigned to the Dormitory Unit, which she suggests shows that they are being singled out for mistreatment. This does not support a reasonable inference of discriminatory animus. *See Loc. 1545, United Mine Workers of Am. v. Inland Steel Coal Co.*, 876 F.2d 1288, 1292 (7th Cir. 1989) (courts consider only "reasonably drawn" inferences in favor of the nonmoving party when deciding summary judgment motions). The point would be stronger if the other reassignment female prisoner did not have comparable mental health or behavioral issues, but Campbell says that the other prisoner was transferred to the Dormitory Unit after that prisoner attempted suicide by stabbing herself in the neck with scissors. Dkt. 65 ¶ 46. The point would also be stronger if all other prisoners with comparable mental health and behavioral issues were being housed in more desirable areas of TCI, but there is no evidence even suggesting that to be the case. Campbell's statements that she is being treated differently than similarly situated prisoners boil down to legal conclusions unsupported by evidence, which isn't sufficient to forestall summary judgment. *See Grant v. Trs. of Indiana Univ.*, 870 F.3d 562,

571 (7th Cir. 2017). In short, the evidence would not permit a reasonable jury finding that Campbell's assignment to the Dormitory Unit was motivated by discriminatory animus against transgender female prisoners.

To recap, the original equal protection claim on which Campbell was proceeding is moot, because she is no longer housed in a single cell. Campbell raises variants of this claim in her summary judgment materials, but I will not allow her last-minute attempts to amend the complaint. And Campbell's reframed claims would fail on the merits anyway, because there are ample non-discriminatory reasons to house her in the dormitory units. I will grant defendants' cross-motion for summary judgment.

For the same basic reasons, I will deny Campbell's cross-motion for summary judgment. As explained, defendants are entitled to summary judgment on both the claim on which Campbell is proceeding and her new claims. Campbell has not shown that "the record is so one-sided as to rule out the prospect of a finding in favor of [defendants] on the claim[s]." *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

ORDER

IT IS ORDERED that:

1. Defendants' cross-motion for summary judgment, Dkt. 41, is GRANTED.
2. Plaintiff's cross-motion for summary judgment, Dkt. 35, is DENIED.
3. Defendants' motion to stay the pretrial filings deadline, Dkt. 67, is DENIED as moot.

4. The clerk of court is directed to enter judgment and close the case.

Entered August 18, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge